Arrest on Out-of-District Offense

# UNITED STATES DISTRICT COURT

FILED
2008 AUG 21 PM 4:16
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

## SOUTHERN DISTRICT OF CALIFORNIA

## ARREST ON OUT-OF-DISTRICT OFFENSE

BY VNA DEPUTY

Magistrate Case Number: '08 MJ 2581

The person charged as Dennis J. Clinton now appears before this United States District Court for an initial appearance as a result of the following charges having been filed in the United States District Court for the Central District of California with Conspiracy, Mail Fraud, Wire Fraud and Aiding and Abetting, in violation of Title 18, United States Code, Sections 371, 1341, 1343 and 2.

The charging documents and the warrant of the arrest of the defendant which was issued by the above United States District Court are attached hereto.

I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: August 21, 2008

[signature]
(Name)
Federal Bureau of Investigation
Special Agent Paul Fuchs

Reviewed and Approved:

Dated: August 21, 2008

[signature]
Assistant United States Attorney, Melanie K. Pierson

FDX
8/21/08
VNA

COPY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, Plaintiff(s) v. DENNIS J. CLINTON, Defendant(s) | CASE NUMBER: SA CR 08 - 00176 |
| | WARRANT FOR ARREST |

TO: UNITED STATES MARSHAL AND ANY AUTHORIZED UNITED STATES OFFICER

**YOU ARE HEREBY COMMANDED** to arrest DENNIS J. CLINTON and bring him/her forthwith to the nearest Magistrate Judge to answer a(n): ☐ Complaint ☒ Indictment ☐ Information ☐ Order of Court ☐ Violation Petition ☐ Violation Notice

charging him/her with: (ENTER DESCRIPTION OF OFFENSE BELOW)

18 U.S.C. § 371: Conspiracy;
18 U.S.C. § 1341: Mail Fraud;
18 U.S.C. § 1343: Wire Fraud;
18 U.S.C. § 2: Aiding and Abetting/ Causing an Act To Be Done

in violation of Title 18 United States Code, Section(s) 371, 1341, 1343 and 2

| | |
|---|---|
| Sherri R. Carter<br>NAME OF ISSUING OFFICER | 18 JUL 2008 SANTA ANA, CA<br>DATE AND LOCATION OF ISSUANCE |
| Clerk of Court<br>TITLE OF ISSUING OFFICER | |
| DODJIE GARGANTOS (SEAL)<br>SIGNATURE OF DEPUTY CLERK | BY: ROBERT N. BLOCK<br>NAME OF JUDICIAL OFFICER |

## RETURN

THIS WARRANT WAS RECEIVED AND EXECUTED WITH THE ARREST OF THE ABOVE-NAMED DEFENDANT AT (LOCATION):

| | |
|---|---|
| DATE RECEIVED | NAME OF ARRESTING OFFICER |
| DATE OF ARREST | TITLE |
| DESCRIPTIVE INFORMATION FOR DEFENDANT CONTAINED ON PAGE TWO | SIGNATURE OF ARRESTING OFFICER |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, Plaintiff(s) v. DENNIS J. CLINTON, Defendant(s) | CASE NUMBER SA CR 08- |
| | **WARRANT FOR ARREST** |

## ADDITIONAL DEFENDANT INFORMATION

| | | | | | | |
|---|---|---|---|---|---|---|
| RACE: | SEX: | HEIGHT: | WEIGHT: | HAIR: | EYES: | OTHER: |
| DATE OF BIRTH: | | PLACE OF BIRTH: | | SOCIAL SECURITY NO.: | DRIVER'S LICENSE NO.: | ISSUING STATE |
| ALIASES: | | SCARS, TATTOOS OR OTHER DISTINGUISHING MARKS: | | | | |
| AUTO YEAR: | AUTO MAKE: | AUTO MODEL: | | AUTO COLOR: | AUTO LICENSE NO.: | ISSUING STATE |
| LAST KNOWN RESIDENCE: | | | | LAST KNOWN EMPLOYMENT: | | |
| FBI NUMBER: ADDITIONAL INFORMATION: | | | | | | |

| | |
|---|---|
| INVESTIGATIVE AGENCY NAME: | INVESTIGATIVE AGENCY ADDRESS: |

NOTES:

COPY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

October 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOHN BRENT LEISKE,<br>PAUL R. MARTIN,<br>ALEX CHELAK,<br>RICHARD ARTHUR PUNDT,<br>WILLIAM JOSEPH FERRY,<br>RONALD J. NOLTE,<br>DENNIS J. CLINTON, and<br>BRAD KEITH LEE,<br><br>Defendants. | NO. SA CR 08-_______<br><br><u>I N D I C T M E N T</u><br><br>[18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 2: Aiding and Abetting/ Causing an Act To Be Done] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A. <u>INTRODUCTION</u>

At all times relevant to this Indictment:

1. Defendant ALEX CHELAK was a resident of Burlington, Ontario, Canada, and a Canadian citizen.

2. Defendant DENNIS J. CLINTON was a resident of San Diego, California.

3. Defendant WILLIAM JOSEPH FERRY was a resident of Corona Del Mar, California.

4. Defendant BRAD KEITH LEE was a resident of San Diego, California.

5. Defendant JOHN BRENT LEISKE was a resident of Lake Oswego, Oregon.

6. Defendant PAUL R. MARTIN was a resident of Wycoff, New Jersey.

7. Defendant RONALD J. NOLTE was a resident of Cooper City, Florida.

8. Defendant RICHARD ARTHUR PUNDT was a resident of Cedar Rapids, Iowa, and an attorney admitted to the Iowa Bar.

9. Special Agents of the Federal Bureau of Investigation (FBI) conducted an undercover investigation into fraudulent investment schemes specifically addressing those persons who fraudulently promised substantial returns on investments with supposedly low or no risk of loss.

10. As part of the undercover investigation, the FBI created an undercover entity (UCE) in Newport Beach, California that purported to be a financial advisory firm. An FBI Special Agent (UCA-1) posed as a partner of the UCE seeking to invest substantial monies for another FBI Special Agent posing as a wealthy client (UCA-2).

11. A "High Yield Investment Program" (HYIP) is a general term given to fraudulent schemes that are known by various specific names, including "Prime Bank Guarantees," "Prime Bank

Debenture Programs," "Medium Term Note Trading Programs," and "Roll Programs." Such programs do not exist as legitimate investment vehicles. In these schemes, the fraud perpetrator claims to have privileged access to secret financial trading programs, which are falsely represented to be sanctioned by the U.S. Federal Reserve Bank, the U.S. Treasury Department, the World Bank, or some other entity involved in international monetary transactions or policy. Claims are typically made that a privileged few are invited to participate in the trading of some form of bank security such as bank guarantees, notes, stocks, or debentures, which can be bought at a discount and sold at a premium. It is often claimed that there are only a few "traders" or "commitment holders" in the world who are authorized to trade these bank securities among the top 25 or 50 banks in the world, often falsely referred to as "Prime Banks." By conducting multiple "trades" in rapid succession, they claim to be able to produce extraordinary rates of returns, far beyond any normal investment. It is often further claimed that one of the primary reasons these trading programs exist is to generate funds for humanitarian purposes and that a portion of the investor's profits must be used to provide humanitarian relief and aid somewhere.

12. Perpetrators of HYIPs claim that a high degree of secrecy is required for an investor to be allowed to participate in the program, and they require the execution of various documents which have no meaning in legitimate financial transactions. Typically, the investor is directed to provide a "Letter of Intent," a "Non-Solicitation Agreement," a

"Confidentiality Agreement," a "Non-Circumvention Letter," a "Bank Proof of Funds," a "Client Information Summary," and a copy of the investor's passport. The investor is typically told that he must go through "compliance," which will purportedly be done by the FBI, The Central Intelligence Agency (CIA), Federal Reserve Bank (Fed) or some other government "compliance officer." The investor is also told that his funds must be verified on a "bank to bank" basis to make sure the funds exist and that the funds must be "good, clean, clear funds of non-criminal origin." The investor typically is assured that his funds are absolutely safe and never at risk in any way. The scheme gradually progresses to its ultimate goal, which is for the defendants to gain control of all or a portion of the investor's funds, or the unauthorized use of the investor-victim's credit.

B. <u>THE CONSPIRACY</u>

Beginning in or around February 2006, and continuing to in or around December 2006, within Orange County, in the Central District of California and elsewhere, defendants LEISKE, MARTIN, CHELAK, PUNDT, FERRY, NOLTE, CLINTON, and LEE ("defendants") and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343.

C. <u>THE PURPOSE OF THE CONSPIRACY</u>

It was the purpose of the conspiracy that the defendants would unjustly enrich themselves through the promotion of a fraudulent high yield investment scheme promising an extremely high return at little or no risk to principal.

D. MANNER AND MEANS OF THE CONSPIRACY

The manner and means through which the purpose of the conspiracy was to be accomplished were as follows:

13. It was a part of the conspiracy that defendants and others would and did make fraudulent representations and promises to the UCAs about defendants' ability to place the UCAs into a "safe" HYIP.

14. It was a further part of the conspiracy that defendants and others would and did fraudulently represent that defendants' HYIP was a "no-risk, secret program."

15. It was a further part of the conspiracy that defendants and others would and did fraudulently represent they had successfully closed previous HYIPs in which extraordinary rates of return were realized by other investors.

16. It was a further part of the conspiracy that defendants and others, in an attempt to give the appearance of legitimacy, would and did falsely represent that in order to be eligible to invest in defendants' HYIP it was first necessary for the UCAs to undergo a "compliance" process, during which time information about the background of the UCAs and the source of their investment funds would be collected and subjected to a "due diligence" scrutiny by, among others, the CIA.

17. It was a further part of the conspiracy that defendants and others, in an attempt to give the appearance of legitimacy, would and did falsely represent that their HYIP was connected with the Fed by claiming, among other things, that:

a. their investment program was a "Fed Trade Program" regulated by the "Fed;"

b. they had to follow strict "Fed guidelines;"

c. their program was administered by a "Fed Trade Administrator" and traded by a "licensed Fed Program trader;" and

d. "compliance" duties were handled by a "Fed Compliance Officer" and that once the investor passed compliance he would become "registered in Washington, D.C. with the Fed."

18. It was a further part of the conspiracy that defendants and others, in an attempt to give the appearance of legitimacy, would and did falsely represent that they would arrange for the UCAs to meet with a Fed official and/or the chairman of the board of a major U.S. bank to confirm the existence of defendants' HYIP.

19. It was a further part of the conspiracy that defendants and others would and did falsely claim that these "Fed" investment programs existed primarily to generate funds for "project funding" and "humanitarian purposes," such as funding Hurricane Katrina relief.

20. It was a further part of the conspiracy that defendants and others, in an attempt to give the appearance of legitimacy, would and did falsely claim that the promised profits from investing in a "Fed" program had to be divided, in equal amounts, with one portion going for some "humanitarian" purpose, another portion for some kind of "project financing," and the remainder to the investor.

21. It was a further part of the conspiracy that defendants and others, in an attempt to give the appearance of legitimacy, would and did prepare and give to the UCAs certain agreements that, among other things, would have created trusts and given

defendants the power of attorney over an offshore bank account into which the UCAs would deposit the funds to be invested ("the UCA offshore bank account").

22. It was a further part of the conspiracy that defendants and others, in an attempt to give the appearance of legitimacy, would and did represent to the UCAs that the UCA offshore bank account would be managed by a Swiss banker who was already managing billions of dollars for defendants.

23. It was a further part of the conspiracy that each defendant would and did assume or play one or more roles in the conspiracy, including:

a. defendant PUNDT acting as a broker or intermediary, responsible for, among other things, introducing prospective investors, such as the UCAs, to the next level of co-conspirators;

b. defendant NOLTE acted as a so-called "Fed Trader Administrator," purportedly responsible for, among other things, "process[ing] the submissions for the Fed Trader" and "get[ting] the proper paperwork to the Compliance Officer;"

c. defendant CHELAK acted as a so-called "Compliance Officer," responsible for, among other things, checking out the background of a prospective investor and the source of his funds;

d. defendant FERRY acted as an "underwriter" and member of the "compliance team," responsible for, among other things, gathering information from the prospective investor for the "second tier of compliance;"

e. defendant MARTIN acted as a banking expert supposedly with expertise in complex international banking

procedures;

f. defendant CLINTON acted as a "troubleshooter" regarding the "compliance" phase of the transaction and the transfer of funds to the Swiss banker;

g. defendant LEE acted as the link to the Swiss banker; and

h. defendant LEISKE acted as a "trader," responsible for, among other things, selecting and implementing the proposed investment trading program.

24. It was a further part of the conspiracy that defendants and others, for the purpose of, among other things, promoting their fraudulent investment program and urging the UCAs to place funds into defendants' fraudulent program, would and did:

a. make repeated interstate telephone calls to the UCAs in California;

b. send interstate facsimile transmissions to the UCAs in California;

c. send email transmissions to the UCAs in California using interstate wire communications; and

d. meet with the UCAs in the Central District of California, and elsewhere.

E. OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants and their co-conspirators, together with others known and unknown to the Grand Jury, committed and caused to be committed in the Central District of California, and elsewhere, the following acts, among others:

25. On or about February 6, 2006, unindicted co-conspirator

J.S. had a phone conversation with UCA-1, in which J.S.:

a. described HYIPs as "a well kept secret" and used by banks, insurance companies, and "major players" to make money as well as to fund "humanitarian projects;" and

b. recommended that UCA-1 speak to PUNDT, an attorney who is "direct with one of the traders" and who will "get your comfort level to where its gotta be as far as what these programs are all about."

26. On or about February 6, 2006, J.S. and PUNDT made a conference call to UCA-1, in which PUNDT stated, among other things, that:

a. he only deals with a "licensed Fed trader" or one who follows the "Fed guidelines;"

b. prospective investors are typically required to submit certain background information so "due diligence" can be performed on them to ensure they do not have "a shaded past of any kind and that [their] funds are clear, clean and unencumbered of non-criminal origin;"

c. "Fed programs" require that a third of the revenue generated through the investment go to "humanitarian projects," another third for "project funding," and the final third to the investor;

d. he had been involved with these kinds of investment programs for nearly four years; and

e. he did not know of any investors who had lost money in these deals and that only if the trader were a "complete idiot," could he lose money.

27. On or about February 15, 2006, PUNDT had a phone

conversation with UCA-1, in which he stated, among other things, that:

a. "typically I work with a Fed Trade Administrator on a Fed platform who works with a [licensed] Fed Trader;" and

b. the "licensed fed trader won't take anything below 500M," and typically only takes deals of $1 billion and above.

28. On or about March 6, 2006, PUNDT had a phone call with UCA-1 in which he offered to introduce UCA-1 to a "bonafide Fed Program Trader," and stated that the "Fed rules are very strict."

29. On or about March 7, 2006, PUNDT sent UCA-1 an email informing him that the "FED Trade Administrator ... must follow very strict procedures," and that "in order to proceed" it would be necessary for UCA-1 to complete certain documents addressed to the so-called "Compliance Officer" and agree to pay 10% of one-third of gross returns on the HYIP investment to "a specific Humanitarian Project."

30. On or about March 8, 2006, PUNDT directed the UCA-1 to complete a document captioned "Protection of Administration Donation Fees" on the letterhead of Coastal Funding Corp. that designated the "R. J. Nolte (non profit) Humanitarian Foundation" as the entity "to which a portion of the required Humanitarian donations are to be paid."

31. On or about March 8, 2006, PUNDT also directed UCA-1 to complete other documents, such as a "Letter of Intent" and a "Proof of Funds," (herein collectively referred to as the

"compliance documents") and return them to PUNDT "for submission to the FED Trade Program administrated through the Trade Administrator Ron Nolte." PUNDT further stated that NOLTE would then arrange for the compliance documents to be submitted to the "Compliance Officer, Mr. Alex Chelak," and once due diligence on UCA-2 was completed, NOLTE or CHELAK would contact UCA-1.

32. On or about March 22, 2006, PUNDT forwarded to UCA-1 an email from NOLTE, in which NOLTE claimed, among other things, that:

a. he was "next to a compliance official for a Tier one Master Trader out of London;"

b. "all that is needed initially for compliance approval and acceptance is a current bank statement, a color passport and a client information sheet, [and then] Washington will give the initial clearance;"

c. "this Trade group is the premier Trade group in the world" and "they will not tolerate any client's [sic] that don't follow their procedures;" and

d. "the U.S. Treasury will oversee the dispersal's [sic] made directly to [the intermediaries] by the Trader."

33. On or about March 23, 2006, PUNDT called UCA-1 and stated that:

a. CHELAK handles "compliance" and "works directly with the CIA."

b. "I know there are people running around saying there is no such thing [as a licensed Fed Trader]. Well they're wrong;"

c. "these trades that are done through the Feds are

done specifically for humanitarian and project funding;" and

d. these trading programs are regulated by the Federal Reserve and only "open to very elite people."

34. On or about April 6, 2006, PUNDT forwarded to UCA-1 an email from NOLTE, in which NOLTE stated that in order to "clear the way for final approval and completion of the contract with the Fed Trader," he needed a current bank statement showing that UCA-2 had $1 billion and UCA-2's agreement to move those funds into another account once he "is registered ... in Washington, D.C."

35. On or about April 6, 2006, PUNDT emailed UCA-1 a "standard Fee Protection Agreement" (FPA) to be signed by UCA-2 covering the fee to be paid to PUNDT and others as intermediaries. According to PUNDT, this FPA was necessary because the "Fed ... will stop the trade" and freeze the funds if an intermediary is not properly paid.

36. On or about April 7, 2006, NOLTE called UCA-1 and stated that UCA-2 "has been approved to move to our first phase of compliance and has been registered in Washington for this transaction."

37. On or about April 7, 2006, PUNDT sent UCA-1 an email, with a "cc" to NOLTE, stating that:

a. UCA-1 has been "introduced to the proper parties" and "will be dealing with the real thing at a very high level;"

b. "this is exclusive and not many people get the opportunity to even get this far;" and

c. "this matter [should] be treated with the greatest of respect and importance."

38. On or about April 7, 2006, PUNDT and NOLTE had a conference phone call with UCA-1, during which time NOLTE told UCA-1 that:

a. UCA-2 has "been registered in Washington, D.C. under our Fed Trader;" and

b. "officially, these type of opportunities do not exist.... its only available to people who have the right contacts to get into them."

39. On or about April 10, 2006, PUNDT had a phone conversation with UCA-1, and stated that:

a. "over 90 percent of [the people in this business] are either totally bad news or cannot perform .... so you have to be extraordinarily careful with whom you deal in this business;" and

b. "I've checked Ron [NOLTE] out, I'm very comfortable with him."

40. On or about April 11, 2006, PUNDT had a phone conversation with UCA-1, and informed him that "Alex Chelak ... the main compliance officer ... will send someone from his compliance team" to meet with UCA-1 and UCA-2 to assist them in completing the necessary documents "for the second level of compliance."

41. On or about April 12, 2006, PUNDT had a phone conversation with UCA-1, and threatened to "stop the transaction now" unless UCA-2 signed the FPA. PUNDT stated that "I'm not gonna use my contacts. This whole business, getting to the right people, is who you know, and the right contacts. And I'm not going to, as an intermediary ... allow this to proceed if he

[UCA-2] doesn't follow the rules."

42. On or about April 14, 2006, UCA-1 faxed PUNDT, at his direction, the signed FPA.

43. On or about April 20, 2006, FERRY met with UCA-1 for the purpose of getting documents completed for the "second level of compliance" and stated that:

a. he was the "underwriter" and travels all over the country "doing this";

b. he has been doing this since 1998-99; and

c. "Alex works through me."

44. On or about April 21, 2006, FERRY met again with UCA-1, and represented that:

a. these trading programs are done primarily to fund foundations to help people all over the world;

b. there was no way to lose money in these programs; and

c. he is currently involved in deals "as high as $100 [billion]."

45. On or about May 4, 2006, UCA-1 emailed to FERRY a document purporting to be a bank account statement showing funds held by UCA-2 with a balance of $1,000,399,934.

46. On or about May 15, 2006, LEISKE, MARTIN, CHELAK, and FERRY met UCA-1 and UCA-2 in Newport Beach, California, during which time the defendants made representations about their purported past successes and experience with various HYIPs, including the following statements by LEISKE:

a. "We've been involved in 44 [high yield] transactions since 1998" and most of them run about $5 billion

each;

b. he knew of no instance where an investor had lost any of his principal investment;

c. they hold an account of about $600 billion accumulated from "prior profits;"

d. On past transactions they have obtained returns ranging from 300 to 600 percent;

e. they have been involved in the funding of about 70 to 80 humanitarian projects, including "all three private satellites" at a cost of $16 billion and another project that cost around $120 billion;

f. they have been audited by the SEC, FBI, Treasury Department, Federal Reserve, and banks, and have passed all of them; and

g. their group consists of attorneys, accountants, and bankers, half of whom work in "national government agencies" while the other half are in the private sector.

47. On or about May 16, 2007, CHELAK, MARTIN, FERRY, and PUNDT met with UCA-1 and UCA-2 in Newport Beach, California, during which time UCA-2 executed a "Trading Authorization Limited Power of Attorney" giving CHELAK, through "AW Trust," the power and authority to use funds from the UCA offshore bank account "to buy, sell and trade in Financial Instruments."

48. On or about May 16, 2007, PUNDT and NOLTE also met with UCA-1 and UCA-2 in Newport Beach, California, during which time,

a. NOLTE stated, among other things, that (A) his main role related to compliance and due diligence for the "first

and second phases," (B) he was involved also because his charitable project was being used to satisfy the requirement that some of the investment proceeds be used for humanitarian purposes, (C) he had provided all his clients in the past to CHELAK, and (D) their HYIP was sanctioned by the Federal Reserve and Treasury;

b. PUNDT indicated, among other things, that he was aware of the warnings on the internet about HYIPs being fraudulent.

49. On or about May 17, 2006, CHELAK and FERRY met with UCA-1 and gave him the coordinates for a test wire transfer of $200 from UCA-2's bank account in the United States to the UCA offshore bank account in London that was to be managed by CAM "for the custody of AW Trust."

50. On or about May 29, 2006, C.C., purportedly a Swiss banker, emailed UCA-2 an agreement relating to the proposed transfer by UCA-2 of $1 billion to an account at Lehman Brothers in London, managed by C.C. through his company CAM.

51. On or about June 4, 2006, LEE and LEISKE entered a "Memorandum of Understanding," signed by CLINTON on behalf of LEISKE, wherein they agreed, among other things, with respect to the anticipated $1 billion investment by UCA-2, that:

a. there would be "two initial distributions" of $250 million pursuant to LEISKE's "instructions," with the first distribution made seven days from the deposit of the $1 billion with CAM, and the second one seven days later; and

b. UCA-2 was a "contact" of LEISKE's and LEE would not communicate with UCA-2 "unless authorized otherwise by"

LEISKE.

52. On or about June 5, 2006, C.C. had a phone conversation with UCA-1 and UCA-2 in which he stated that his contacts were through CLINTON and LEE.

53. On or about June 5, 2006, CHELAK had a phone conversation with UCA-1 and stated that C.C.'s role was as "custodian" only, and that LEISKE had a $600 Billion account with C.C.

54. On or about June 6, 2006, CHELAK had a phone conversation with UCA-1 and declared that CLINTON and LEE work directly for LEISKE.

55. On or about June 12, 2006, CLINTON and FERRY met with UCA-1, in Newport Beach, California, to resolve any problems concerning the delay in executing the test wire of funds from the UCA bank account to CAM. Among other things, CLINTON stated that he worked for LEISKE and was in direct contact with others, including CAM and LEE. CLINTON stated that LEE "needs a phone call as soon as we're ready [to send the test wire]." CLINTON also told UCA-1 that he had been in "this business" for about 15 years and that:

> you have a real simple deal basically. Your simple deal is that you have a guarantee that your principal will come back and you will make 20% period.

56. On or about June 12, 2006, upon leaving the meeting with UCA-1, CLINTON called LEISKE and LEE on his cell phone.

57. On or about September 14, 2006, CHELAK called UCA-1 and stated that LEISKE had been unable to complete the transaction for UCA-2 because LEISKE was still working on a "huge" deal involving "many many B's" and that the "agency boys"

wanted LEISKE to finish that one before doing the one for UCA-2.

58. On or about September 19, 2006, CHELAK called UCA-1 and stated that "Brent [LEISKE] runs everything ... he runs the whole show," and that LEISKE was arranging for UCA-2 to speak to a "Fed Official" to verify the existence of the trading programs in which UCA-2 would be investing his $1 billion.

59. On or about October 10, 2006, PUNDT had a phone conversation with UCA-1, in which PUNDT attempted to dissuade UCA-1 from contacting some other group offering high yield investments because, despite the delays in getting the investment completed, CHELAK is "the real thing and his trader is licensed."

60. In or about September or October 2006, LEE provided to an Indian Tribal Executive Board in Montana a copy of the bank statement identified in paragraph 45 above, falsely claiming that LEE had control over the $1 billion in that account.

All in violation of Title 18, United States Code, Section 371.

COUNTS TWO through FOUR

[18 U.S.C.§§ 1341 and 2]

61. Paragraphs 1 through 12 are realleged and incorporated herein by reference, as if set forth in full.

62. Beginning in or about February 2006, and continuing to in or about December 2006, in the Central District of California, and elsewhere, defendants JOHN BRENT LEISKE, PAUL R. MARTIN, ALEX CHELAK, RICHARD ARTHUR PUNDT, WILLIAM JOSEPH FERRY, RONALD J. NOLTE, DENNIS J. CLINTON, and BRAD KEITH LEE ("defendants") and others both known and unknown to the Grand Jury, aiding and abetting each other, knowingly devised, intended to devise, and participated in a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme is described in paragraphs 13 through 24 of this Indictment, which paragraphs are incorporated herein by reference.

63. On or about the dates listed for each count below, in the Central District of California and elsewhere, for the purpose of executing the aforesaid scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, defendants caused to be delivered by the U.S. Postal Service, and private and commercial interstate carrier, according to the directions thereon, the matters and things listed below:

//

//

//

| COUNT | DATE | ITEM MAILED |
|---|---|---|
| 2 | 5/18/06 | Bank of America "Funds Transfer Request and Authorization" form signed by "George Tarpinski" sent by Federal Express by FERRY from Corona del Mar, California, to LEISKE in Lake Oswego, Oregon |
| 3 | 7/25/06 | Agreement between CAM and New Mar Mesa Group sent by Federal Express by CLINTON from San Diego, California, to FERRY in Corona del Mar, California |
| 4 | 8/17/06 | Various documents, including a letter from CAM dated August 14, 2006, counter signed by "George Tarpinksi," sent by Federal Express by FERRY in Corona del Mar, California, to CLINTON in San Diego, California |

All in violation of Title 18, United States Code, Sections 1341 and 2.

COUNTS FIVE through TEN

[18 U.S.C.§§ 1343 and 2]

64. Paragraphs 1 through 12 are realleged and incorporated herein by reference, as if set forth in full.

65. Beginning on or about February 2006, and continuing to in or about December 2006, in the Central District of California, and elsewhere, the defendants, JOHN BRENT LEISKE, PAUL R. MARTIN, ALEX CHELAK, RICHARD ARTHUR PUNDT, WILLIAM JOSEPH FERRY, RONALD J. NOLTE, DENNIS J. CLINTON, and BRAD KEITH LEE ("defendants") and others both known and unknown to the Grand Jury, aiding and abetting each other, knowingly devised, intended to devise, and participated in a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme is described in paragraphs 13 through 24 of this Indictment, which paragraphs are incorporated herein by reference.

66. On or about the dates listed for each count below, in the Central District of California and elsewhere, for the purpose of executing the aforesaid scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, the defendants transmitted, caused to be transmitted, and aided and abetted the transmission, by means of wire communications in interstate and foreign commerce, the following writings, signs, signals, and sounds:

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 5 | 3/23/06 | Telephone call from PUNDT in Iowa to UCA-1 in Newport Beach, California |
| 6 | 4/17/06 | Telephone conference call from CHELAK in Canada and NOLTE in Florida to UCA-1 in Newport Beach, California |
| 7 | 4/17/06 | Telephone call from NOLTE in Florida to UCA-1 in Newport Beach, California |
| 8 | 6/6/06 | Telephone call from UCA-1 in Newport Beach, California to CHELAK in Canada |
| 9 | 6/8/06 | Telephone conference call from CHELAK in Canada, MARTIN in New Jersey, and FERRY in California to UCA-1 in Newport Beach, California |
| 10 | 9/14/06 | Telephone call from CHELAK in Canada to UCA-1 in Newport Beach, California |

//

//

//

//

//

//

//

//

//

//

//

//

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL

____________________________
FOREPERSON

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

ROBB C. ADKINS
Assistant United States Attorney
Chief, Santa Ana Branch Office

STEVEN A. TYRRELL
Chief, Fraud Section
Criminal Division
United States Department of Justice

JOEL E. LEISING
Senior Trial Attorney
Criminal Division
United States Department of Justice